*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* CLEVELAND/GRANT/WEAVER, Minors.

UNPUBLISHED
October 15, 2019

No. 343832
Wayne Circuit Court
Family Division
LC No. 17-001147-NA

Before: O'BRIEN, P.J., and BECKERING and LETICA, JJ.

PER CURIAM

Petitioner, the Department of Health and Human Services ("DHHS"), appeals by leave granted[1] the trial court's order declining to terminate respondent-mother's parental rights to the minor children, JG, SW, AC, and AMC. The trial court held that petitioner failed to establish by clear and convincing evidence at least one statutory ground for termination under MCL 712A.19b(3).[2] We affirm.

## I. RELEVANT FACTS AND PROCEEDINGS

The petition to terminate respondent's parental rights arose after an incident on July 11, 2017, where AMC suffered second- and third-degree burns to 70% of her body while in respondent's care. Three days later, petitioner filed a petition requesting that respondent's parental rights to the children be terminated under MCL 712A.19b(3)(b)(*i*) and (*ii*), (3)(g), (j), and (k)(*v*). The trial court authorized the petition on July 20, 2017, and on November 30, 2017, respondent pleaded no contest to the trial court's jurisdiction. A hearing on whether to terminate respondent's parental rights commenced on April 23, 2018.

---

[1] *In re Cleveland/Grant/Weaver Minors*, unpublished order of the Court of Appeals, entered August 23, 2018 (Docket No. 343832).

[2] The trial court terminated the parental rights of the children's fathers, but none has appealed those decisions.

Respondent testified at the termination hearing that at the time of AMC's injuries, she was home with four-year-old SW, and eight-month-old twins, AMC and AC. At around 7:30 p.m., respondent's boyfriend, TK, called her and told her to get the kids ready for the babysitter because he was taking her to the movies. Respondent testified that she "started to get [the kids] ready to go" around "maybe 8:15, near 8:20[.]" She "sat the twins down on the floor with some toys" in the hallway outside of the bathroom, and she told SW "to go put his coat on." Respondent then "walked away to get the kids some clothes to put on [and] to pack their diaper bags . . . ." Respondent testified that she "was away for like a couple of minutes"[3] when she heard AMC "like whining," which she thought might be due to AC doing something to upset AMC as they sat next to each other. When she walked back, she saw AMC in the baby tub that sat in the larger bathtub, and she ran in and "grabbed her out . . . ." Respondent said that while she had the television on, she never heard any water running in the tub, the water was not running when she went in the bathroom to get AMC, and she did not know there was water in the baby tub until she grabbed AMC.

Respondent testified that SW told her that he put AMC in the tub, and he said "[h]e was sorry" and that "[h]e thought the water was cold[.]" Respondent also testified that SW had never given the twins a bath before, but had observed respondent do it "all the time." SW had asked before if he could give the twins a bath, but respondent told him she did not need any help, other than to hand her the soap or a towel. Respondent testified that AMC "probably" had on only a diaper, as it was a hot summer day; because AMC was not wearing it when respondent pulled her out of the baby tub, respondent was "pretty sure" that SW took it off.

When respondent lifted AMC out of the water, AMC's skin instantly began to peel off. Respondent testified that after she pulled AMC out of the water, AMC "actually stopped making noises. She didn't cry. She was just looking. I guess at that point she was in shock." Respondent said that she "started panicking" and called TK and her Aunt Vicki, who both came over to her house. Respondent grabbed "the softest shirt [she] could find and wrapped it around [AMC] and went to the hospital." Respondent became emotional while testifying to AMC's condition when she picked her up from the tub and while recounting the medical treatments AMC received because of her burns. The children's lawyer-guardian ad litem [LGAL] asked respondent if she thought she did anything wrong. Respondent replied:

> Yeah, I kept my head turned too long and it resulted in my baby being burned and almost losing her life. But as far as causing her injuries, it's not on me because if [SW] wouldn't have been home that day then we wouldn't be here today because that way [AMC] would have never ended up in the bathtub getting burned.

When the LGAL responded, "I get that you're saying you didn't cause the injuries it must have been [SW,]" respondent clarified, "It's my fault. I kept my head turned too long, you know. . . ." At one point, after again acknowledging that she "kept her head turned too long," respondent said, "I should have been paying more attention."

---

[3] Respondent later estimated that she was away between three and five minutes.

DHHS caseworker Maisha DeBrossard testified that she was contacted on July 12, 2017, in response to reports from St. Johns of "a child being severely burned with nonaccidental injuries." DeBrossard testified that she spoke with the medical professionals treating AMC, and based on those conversations, it was her understanding that AMC's injures were "not accidental." She stated that AMC was in the hospital for approximately three months before she could be released, and that respondent "never expressed any accountability for any of her actions."

Dr. Marc Cullen, the chief of pediatric surgery at St. John's Hospital where AMC was initially treated, testified as an expert in pediatric surgery and "burns specialist." He explained that AMC had a combination of severe second- and third-degree burns, and described the injuries as "life-threatening." Based on the admitting history of a 15-20 second immersion, Dr. Cullen estimated that for AMC to suffer burns so severe, the water had to have been 133°F. He noted that with something very hot, it would take a very short period of time to burn a child's skin. He also noted that the baby could have been in the water longer at a lower temperature, and stated before being interrupted that "if you put your hand in [124 degree water], and don't [sic] it takes about three minutes to get to –." As a guideline, Dr. Cullen testified, "the product of time times temperature equals burn depth with the understanding that your skin is of different thicknesses." Dr. Cullen did not know what the water temperature was in respondent's house, but testified that there was "no question" that an eight-month-old baby would immediately start crying if placed in 133 degree water. If the baby went into shock, such that it would not be crying, as occurred at the hospital, it would be at some time after the injury from "pain and fluid losses associated with" the injury. He opined that while a four-year-old or a six-year-old child would not likely have the neurocognitive functioning to predict what water temperature might be harmful, he also expressed his doubt that a child of that age would be physically capable of lifting a baby over the edge of a bathtub and placing her perfectly in a baby tub situated within the bathtub.

SW, who was five years old at the time of the hearing and testified on behalf of respondent, said that respondent asked him "to help her wash up [AMC]." He said that respondent sat AMC on the floor and had SW run the water. SW indicated, somewhat unclearly, that, at some point, respondent left the bathroom to go to the living room and clean up some food that AMC had spilled. While respondent was in the living room, SW placed AMC in the baby tub situated inside the larger tub. SW testified that when he placed AMC in the water in the baby tub, "she was moving around making sounds and then [respondent] had run over there" and took AMC out of the tub. SW clarified that he turned the water on, and then turned it off before placing AMC in the tub. Although SW's testimony contradicted that of respondent with regard to whether respondent asked him to help her bathe AMC, SW consistently maintained that he drew the bathwater and put AMC in the baby tub.

After hearing the parties' closing arguments, the trial court noted that it had listened to the testimony, looked at the Clinic for Child Study report, and reviewed AMC's medical records. The court suspected that respondent had stepped away for more than two or three minutes at the time of the incident, but it found that SW placed AMC in the water. The trial court then discussed how the burden was on petitioner to prove a statutory ground by clear and convincing

evidence, which was "a high level of proof." The trial court acknowledged that the Clinic for Child Study report[4] clinician "saw nothing like remorse in" respondent, but the court stated that it saw "lots of remorse in" respondent. The trial court concluded that it could not "necessarily say that if this child was put back in [respondent's] home it's going to get injured again." The trial court thereafter declined to terminate respondent's parental rights.

## II. ANALYSIS

Petitioner argues that the trial court clearly erred when it failed to terminate respondent's parental rights after hearing testimony that respondent's neglect resulted in life-threatening injuries to AMC and that she blamed all of the child's injuries on SW. Specifically, petitioner contends that the trial court clearly erred when it it failed to terminate respondent's parental rights under MCL 712A.19b(3)(g), (j), and (k)(v).[5] We disagree.

To terminate parental rights, a trial court must find by clear and convincing evidence that at least one statutory ground under MCL 712A.19b(3) has been established." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). This Court "review[s] for clear error a trial court's finding of whether a statutory ground for termination has been proven by clear and convincing evidence." *Id*. "A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made." *In re LaFrance*, 306 Mich App 713, 723; 858 NW2d 143 (2014). Clear and convincing evidence is "evidence so clear, direct and weighty and convincing as to enable [the fact-finder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re Martin*, 450 Mich 204, 227; 538 NW2d 399 (1995 (quotation marks and citation omitted). Uncontroverted evidence still may not be "clear and convincing," and "evidence may be 'clear and convincing' despite the fact that it has been contradicted." *Id*. (citation omitted). In addition, this Court generally defers to the special ability of the trial court to judge the credibility of witnesses. *In re White*, 303 Mich App 701, 711; 846 NW2d 61 (2014), citing MCR 2.613(C); also citing *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989).

---

[4] The Clinic for Child Study report was prepared on February 23, 2018, and was admitted as an exhibit at the start of the termination hearing.

[5] In its petition, DHHS also advanced MCL 712A.19b(3)(b)(*i*) (parent's act caused physical injury to child) and (*ii*) (parent who could prevent physical injury to the child failed to do so) as providing grounds for the termination of respondent's parental rights. On appeal, neither petitioner nor the children's LGAL argue that the trial court clearly erred by ruling that petitioner had not established these grounds for termination. Therefore, we deem petitioner to have abandoned its contention that these statutes provide grounds for termination. See *Berger v Berger*, 277 Mich App 700, 712; 747 NW2d 336 (2008) ("A party abandons a claim when it fails to make a meaningful argument in support of its position.").

To establish MCL 712A.19b(3)(g)[6] as a statutory ground for termination, there must be clear and convincing evidence that, regardless of intent, the parent "fail[ed] to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." Termination under MCL 712A.19b(3)(j) requires clear and convincing evidence of a "reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." Finally, termination under MCL 712A.19b(3)(k)(*v*) requires clear and convincing evidence that the parent "abused the child or a sibling of the child and the abuse included . . . life-threatening injury."

Turning first to MCL 712A.19b(3)(k)(*v*), petitioner argues that the trial court had clear and convincing evidence that AMC suffered life-threatening injuries and that she was in respondent's care when the injuries occurred. This much is true; however, in order to terminate a parent's rights based on MCL 712A.19b(3)(k)(*v*), there must be clear and convincing evidence that the parent "abused the child or a sibling." There was no such evidence in the present case. The trial court found that SW, not respondent, put AMC in the scalding water. Petitioner advances no discernable argument that the court's finding was clearly erroneous nor identifies any specific act of abuse perpetrated by respondent. Petitioner simply describes AMC's injuries, which are indeed serious, reminds this Court that there were inconsistencies in the testimony at the termination hearing, and reiterates its position that respondent took no responsibility for her actions. None of this convinces us that the trial court clearly erred in finding that respondent did not place AMC in the baby tub or that clear and convincing evidence established the statutory grounds for termination pursuant to MCL 712A.19b(3)(k)(*v*). To the extent that petitioner is tacitly inviting this Court to make reassessments of the credibility and weight of the testimony, we decline to do so. See *In re Miller*, 433 Mich at 337 ("The trier of fact has the advantage of being able to consider the demeanor of witnesses in determining how much weight and credibility to accord their testimony."). Thus, we conclude that the trial court did not clearly err by declining to terminate respondent's parental rights pursuant to this statutory provision.

We turn next to MCL 712A.19b(3)(g) and (j). In their closing arguments in the trial court, neither petitioner nor the LGAL for the children advanced arguments identifiable as pertaining to MCL 712A.19b(3)(g). On appeal, the LGAL implies that respondent's alleged failure to take responsibility for AMC's injuries indicates that she will not be able to provide proper care and custody of her children in a reasonable time, given their ages. With regard to MCL 712A.19b(3)(j), both petitioner and the LGAL argue that respondent's alleged failure to take responsibility signifies the likelihood that the children will be harmed if returned to her care. Thus, the dispositive question is whether the record shows clear and convincing evidence of respondent's lack of remorse and avoidance of responsibility so as to establish grounds for termination under either (3)(g) or (3)(j). The trial court found that it did not, and petitioner has not established that the trial court clearly erred in making that finding.

---

[6] The Legislature's relatively recent amendment of MCL 712A.19b(3)(g) did not go into effect until after the termination hearing at issue. 2018 PA 58, effective June 12, 2018.

-5-

As noted above, the record shows that, in reaching its decision, the trial court was aware of and considered the Clinic for Child Study report and its conclusion that respondent lacked remorse, the nature of AMC's "horrific injuries," and Dr. Cullen's testimony regarding how those injuries likely came to be. The court heard the inconsistent testimony regarding some of the details surrounding AMC's injuries, but it also heard SW's unchanging testimony that he drew the bath and placed AMC in the baby tub. The trial court heard respondent's acknowledgement that AMC's injuries ultimately were her fault because she "kept [her] head turned too long" and that she "should have been paying more attention," and the court observed respondent's demeanor during her testimony. Further, it heard respondent's testimony that she had always met her children's physical needs, and that her oldest child was seven years old and she had never had any prior contact with DHHS about any possible abuse of her children.

This record does not compel us to conclude that the trial court clearly erred in ruling that there were no statutory grounds for termination. In order for petitioner to prevail, we would have to discount the trial court's determination of the weight and credibility of the witnesses' testimony. As already indicated, however, these were matters for the trial court to determine. See *In re Martin*, 450 Mich at 227. Petitioner has given us no reason to find clear error in the trial court's findings. Petitioner argues that respondent is likely to harm her children because she has not admitted that she did anything wrong or accepted responsibility for AMC's injuries. Respondent's testimony and demeanor, if believed, belies this assertion. It appears to us that the trial court credited respondent's testimony, and we will not disturb the trial court's credibility assessment. *Shann v Shann*, 293 Mich App 302, 305; 809 NW2d 435 (2011) ("We defer to the trial court's credibility determinations given its superior position to make these judgments."). Moreover, although respondent continued to assert that SW put AMC in the scalding bathwater, this assertion is consistent with SW's unvarying testimony and with the trial court's finding, and we do not think it inconsistent with respondent's remorsefulness and acceptance of responsibility for AMC's injuries. Thus, we conclude that the trial court did not clearly err in ruling that clear and convincing evidence did not establish any of the statutory grounds for terminating respondent's parental rights.

Affirmed.

/s/ Jane M. Beckering
/s/ Anica Letica